# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00541-CV

---

### Wylie Cavin and Lillian Cavin, Appellants

### v.

### William Abbott, Appellee

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-16-000201, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

For more than a decade, the Cavins and the Abbotts have been involved in litigation arising out of "'family tumult over an adult daughter's choice of a husband,' specifically the marriage of Kristin and Bill Abbott despite the vociferous opposition of Kristin's parents, Wylie and Lillian Cavin." *Cavin v. Abbott* (*Cavin II*), No. 03-18-00073-CV, 2018 WL 2016284, at *1 (Tex. App.—Austin Apr. 30, 2018, pet. denied) (mem. op.) (quoting *Cavin v. Abbott* (*Cavin I*), 545 S.W.3d 47, 49 (Tex. App.—Austin 2017, no pet.)). After the trial court signed its final judgment in December 2023 in the consolidated case that had originated as four separately filed lawsuits, the Cavins appealed from the trial court's 2018 grant of Abbott's motion to dismiss brought under the Texas Citizens Participation Act (TCPA) and related

orders.[1]  *See* Tex. Civ. Prac. & Rem. Code §§ 27.001-011.[2]  For the reasons explained below, we affirm the trial court's orders granting the TCPA motion to dismiss, denying the Cavins' motion for limited discovery under TCPA Section 27.006(b), overruling the Cavins' objections to Abbott's affidavit in support of his TCPA motion, and granting Abbott's motion for attorneys' fees and sanctions under the TCPA.

## BACKGROUND

The underlying facts and procedural history are well-known to the parties and have been set out at length in our prior opinions.[3]  Thus, we will limit our discussion of the facts and procedural history to those relevant to our analysis of the trial court's order granting Abbott's TCPA motion.

**Factual Background**

This long-running family dispute arose when Kristin's parents, the Cavins, began expressing disapproval over Kristin's decision to date Abbott, whom Kristin eventually married.

---

[1]  We refer to appellant William (Bill) Abbott as "Abbott" and to Kristin Abbott as "Kristin" because Kristin's last name changed over the course of the litigation.  We refer to the Cavins by their first names when referring to them individually.

[2]  Although the Texas Legislature amended the TCPA in 2019, the prior version of the statute continues to control cases filed before September 1, 2019.  *See* Texas Citizens Participation Act, 86th Leg., R.S., ch. 378, §§ 11-12, 2019 Tex. Gen. Laws 684, 687 (providing that amendments apply to actions filed on or after September 1, 2019).  Thus, all references to the TCPA in this opinion are to the version that applies to this dispute.  *See generally* Texas Citizens Participation Act, 82d Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, 961-64 (codified at Tex. Civ. Prac. & Rem. Code §§ 27.001-011) ("Prior Tex. Civ. Prac. & Rem. Code §§ 27.001-011").  Where the text of the TCPA was not amended in 2019, we omit the word "Prior" from the citation.

[3]  In addition to *Cavin I* and *Cavin II*, we have issued opinions in the following docket numbers: No. 03-17-00501-CV, No. 03-18-00113-CV, No. 03-19-00168-CV.

Kristin and Abbott met when both worked at the Public Utility Commission but assert that they did not begin dating until after Kristin left the PUC in 2013 to pursue a graduate degree. The Cavins characterize their behavior as motivated by their desire "to ensure their daughter's safety and wellbeing," while the Abbotts (in the suit they filed against the Cavins) describe the Cavins' behavior as

> a coordinated campaign and scheme of retaliation that involved the Cavins' engagement in defamation, personal property conversion, harassment, stalking, and emotional antagonism directed against their adult daughter, Kristin, and Kristin's husband, Bill, in response to Kristin's decision to pursue a relationship with, and marry, Bill Abbott, and to cover up Wylie Cavin's physical assault of Kristin.

The dispute in this appeal centers on communications that Abbott made with various supervisors at his workplace, the Public Utility Commission, after he received a series of text messages from Wylie that Abbott perceived as threatening him with a confrontation at the parking garage at his PUC office. He received these texts on the same day in late February 2014 that there had been a physical altercation between Wylie and Kristin, which formed the basis for Kristin's assault claim in the Abbotts' suit against the Cavins described below. A few days later, in March 2014, Lillian raised sexual-harassment and domestic-violence allegations against Abbott by visiting the PUC and speaking with Angie Wolf, the PUC's human-resources director. Wolf documented this meeting in an email to the Abbotts.

Then a few days after that, Wylie sent a letter to Wolf stating that there might be domestic violence going on between Kristin and Abbott. At that point, the PUC investigated the Cavins' allegations against Abbott. On the same date as Wylie's letter, Wolf sent Abbott an email to inform him that the Department of Public Safety was sending over Agent Rudy Torres

3

to speak with Abbott that day, and she provided a conference room for their meeting. Wolf testified that after a full investigation, the PUC "didn't find any merit in these accusations." In connection with that investigation, Abbott provided the PUC with a written statement summarizing his relationship with Kristin. Abbott and Kristin later filed a police report against the Cavins for stalking and harassment, but the district attorney declined to charge the Cavins. In addition, Abbott attested that he met with Agent Torres with the Criminal Investigations Division of the Department of Public Safety and that Agent Torres instructed him to keep the PUC informed of any developments regarding the Cavins and any attempts by them to contact Abbott or Kristin. Abbott attested that the emails he sent to the PUC documenting contact from the Cavins were sent to keep the PUC apprised of the ongoing dispute between the Abbotts and the Cavins.

Kristin attested that in addition to Wylie's physical attack on her in February 2014, which she reported to the police, in April 2014, the Cavins "tracked me down while I was attending a class at the University of Texas at Austin. [Lillian] approached me in the hallway and physically assaulted me. When I got away I immediately called the police." Kristin also attested that "[f]or months my parents attempted to contact me after receiving explicit instructions by the police not to. Like my husband, I was also worried my parents would continue their unwelcomed contact by visiting and contacting the [PUC]." Kristin had returned to employment at the PUC in a different division than the one Abbott worked in.

In September 2014, a package was delivered to the PUC for Kristin containing a birthday present from the Cavins, which Kristin informed PUC staff and Wolf by email that she found "extremely upsetting and disturbing," and she asked the staff not to sign for or accept any packages directed to her in the future. The staff agreed. Wolf testified that after Wylie sent

4

another letter in 2015 accusing Abbott of abusing Kristin, and Kristin provided the PUC with a letter that the Austin Police Department had sent the Cavins instructing them not to contact the Abbotts, the PUC sent a letter informing the Cavins that they were not welcome at the PUC. However, Wolf had previously internally notified PUC staff in March 2014 in an email titled, "Process for Unauthorized Visitor," that if the Cavins showed up at the PUC, reception staff was to contact a list of six employees in a specified order, beginning with Wolf, until they reached someone to come to main reception to speak to them. Wolf testified that regardless of whether charges were ultimately brought against the Cavins, the PUC wants its employees to feel safe while they are at work; therefore, they sent the Cavins the 2015 letter because they wanted the Abbotts to feel safe at work.

**Procedural Background**

As we explained in *Cavin II*,

> The controversy (thus far) has spawned what originated as four separately filed lawsuits: (1) a $1 million defamation suit filed in mid-2015 by the Cavins against Sandy Whitley, Lillian's sister and a supporter of the Abbotts in the family schism; (2) a second $1 million defamation suit filed by the Cavins later in 2015 against Sandy's husband and fellow Abbott ally, David Hayes; (3) the lawsuit filed by the Abbotts in early 2016 against the Cavins and Lillian's business (Eagle Radiology, PLLC) that became the immediate focus of the *Cavin I* appeal; and (4) yet another defamation suit filed by the Cavins, in mid-2016, this time targeting Bill Abbott, which was consolidated shortly thereafter into the Abbotts' *Cavin I* lawsuit.

*Cavin II*, 2018 WL 2016284, at *1. The fourth lawsuit was consolidated into the third lawsuit (Consolidated Suit), and the Whitley and Hayes defamation suits were ultimately consolidated into the Consolidated Suit. The Cavins nonsuited their claims against Whitley and Hayes in August 2022.

5

The order at issue in this appeal granted Abbott's TCPA motion to dismiss the Cavins' defamation suit. Because the Cavins' appellate issues touch on the timing of the consolidation of their defamation suit, which was filed in county court at law (County Suit), with the Abbotts' suit, which was filed in district court (District Suit), we provide a summary of key procedural events relevant to this appeal here:

- 2015      **Cavins file Whitley and Hayes Suits**

- 11/17/15   Cavins issue discovery subpoenas seeking documents from both Abbotts in the Whitley Suit

- 1/14/16     **Abbotts file District Suit against Cavins**

- 6/1/16      Court denies Cavins' TCPA motion to dismiss Abbotts' claims in District Suit

- 6/8/16      Cavins file a notice of appeal in this Court to appeal trial court's order denying their TCPA motion to dismiss Abbotts' District Suit, under 51.014(a)(12) resulting in **automatic stay of proceedings** under 51.014(b)

- 7/22/16    **Cavins file County Suit against William Abbott**

- 8/15/16     Abbott answers in County Suit

- 9/13/16     County-court judge signs **order consolidating County Suit into District Suit (Consolidated Suit)**

- 9/19/16     File-stamped copy of consolidation order docketed in Consolidated Suit

- 10/19/16   Rule 11 agreement signed by all parties regarding depositions in Consolidated, Whitley, and Hayes Suits

- 11/7/17     This Court issued mandate in *Cavin I*, ending automatic statutory stay of District Suit

- 11/8/17     Abbott files TCPA motion to dismiss Cavins' defamation claims against him in Consolidated Suit

- 11/14/17   Expiration of Abbott's 60-day deadline to file TCPA motion to dismiss (according to Abbott's calculation)

6

- 1/17/18     District court signs order granting Abbott's TCPA motion to dismiss

- 2/1/18      District court signs order overruling Cavins' objections to Abbott's affidavit in support of his TCPA motion to dismiss

- 2/7/19      District court signs order on Abbott's motion for attorneys' fees and sanctions under the TCPA.

After the Cavins nonsuited their claims in the Whitley and Hayes Suits in August 2022, Kristin nonsuited her assault claim against Wylie in August 2023. On December 15, 2023, the district court signed an order clarifying that all claims of all parties had been dismissed or adjudicated and stating that it was a final and appealable order. We turn now to the issues on appeal.

## ANALYSIS

The Cavins challenge the trial court's grant of Abbott's TCPA motion in four issues. First, they contend that the trial court erred by granting the TCPA motion because the motion was filed outside the statutory deadline. Second, the Cavins assert that they presented clear-and-specific evidence supporting each essential element of their defamation claim and that Abbott failed to establish any affirmative defense. Third, they argue that the trial court abused its discretion by refusing their request for limited discovery to assess the merits of Abbott's affirmative defenses and the affidavit he filed in support of the TCPA motion and by overruling their objections to Abbott's TCPA evidence. Fourth, the Cavins challenge the amount of the attorneys' fees and sanctions that the trial court awarded to Abbott.

## I.     Timeliness of Abbott's TCPA motion

The Cavins assert that the trial court erred by granting Abbott's TCPA motion because it was filed more than 60 days after he was served with the County Suit. The Cavins served Abbott with their petition in that suit on July 22, 2016. At that time, the Cavins' interlocutory appeal from the denial of their TCPA motion filed in the District Suit was pending in this Court, resulting in an automatic stay of the proceedings in the District Suit. *See* Tex. Civ. Prac. & Rem. Code § 51.014(b). After Abbott answered in the County Suit, he moved to consolidate the County Suit into the District Suit. The county-court judge signed an order that consolidated the County Suit with the District Suit on September 13, 2016, and that order was filed in the District Suit on September 19, 2016.[4] After the Cavins' appeal in this Court concluded and we issued our mandate on November 7, 2017, ending the automatic statutory stay, Abbott filed his TCPA motion to dismiss in district court in the now-Consolidated Suit.

The Cavins argue that the statutory stay in place in the District Suit did not operate to toll the 60-day deadline for Abbott to file the TCPA motion, that the district court did not have the authority to docket the consolidation order from the County Suit while the District Suit was stayed, and that Abbott did not assert that "good cause" existed to extend the 60-day deadline. In response, Abbott argues that the statutory stay prevented him from filing a TCPA

---

[4] The Cavins did not challenge the consolidation order either by mandamus or in this appeal. *See In re Van Waters & Rogers, Inc.*, 145 S.W.3d 203, 210 (Tex. 2004) (orig. proceeding) (concluding that although mandamus typically does not lie from trial court's consolidation order, if consolidation would result in party's permanent loss of substantial rights, mandamus relief may be warranted); *In re Gulf Coast Bus. Dev. Corp.*, 247 S.W.3d 787, 794 (Tex. App.—Dallas 2008, orig. proceeding) (explaining that although Rule 174 gives "the trial court broad discretion to consolidate cases with common issues or law or fact. . . . [a] trial court may abuse its discretion by 'incorrectly resolving the relatedness issue' or by consolidating cases when the consolidation results in prejudice to the complaining party").

motion (or any other motion) after the County Suit was consolidated into the District Suit until the stay ended, that the county court had authority to sign the consolidation order that was then file-stamped by the district court's clerk, and that he argued to the trial court that good cause existed for extending the 60-day deadline, and thus, we must imply that the trial court found good cause existed because it granted Abbott's TCPA motion.

We address only the good-cause argument because it is dispositive. A TCPA motion to dismiss "must be filed not later than the 60th day after the date of service of the legal action. The court may extend the time to file a motion under this section on a showing of good cause." Prior Tex. Civ. Prac. & Rem. Code § 27.003(b). We review the grant of a motion for extension of time under the TCPA for an abuse of discretion. *See Morin v. Law Off. of Kleinhans Gruber, PLLC*, No. 03-15-00174-CV, 2015 WL 4999045, at *3 (Tex. App.—Austin Aug. 21, 2015, no pet.) (mem. op.) (analyzing whether trial court abused its discretion by finding that TCPA movant did not have good cause under Section 27.004(a) to set his TCPA motion for hearing more than 60 days after motion was filed); *cf. BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002) (reviewing denial of motion for continuance for clear abuse of discretion).

A trial court abuses its discretion by acting arbitrarily and unreasonably, without reference to any guiding rules and principles, or by analyzing the law incorrectly or misapplying the law to the established facts of the case. *Huynh v. Blanchard*, 694 S.W.3d 648, 674 (Tex. 2024); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The trial court was not required to issue findings of fact or conclusions of law after ruling on the TCPA motion, and therefore, we imply all necessary findings of fact to support its order. *See*

9

*Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam). We must affirm the judgment "if it can be upheld on any legal theory that finds support in the evidence." *Id.*

In Abbott's TCPA motion, he explained that the County Suit was consolidated into the District Suit while the District Suit was stayed and asserted that "this motion is timely under the TCPA," citing Section 27.003(b). In the Cavins' response to the TCPA motion, they contended that the statutory stay in the Consolidated Suit did not toll Abbott's deadline for filing his TCPA motion, asserting that if the trial court could accept the County Suit for consolidation during the stay, it could also have accepted a motion to dismiss.

On appeal, the Cavins assert that Abbott did not request an extension for good cause in the trial court and the trial court did not make a good-cause finding. However, the record reflects that at the hearing on Abbott's motion to dismiss, Abbott expressly argued that if the trial court determined the motion was untimely, there was "good cause to allow it to continue."[5] Abbott argued, "courts haven't fully developed what good cause means, but it is— what we do know, it's at the discretion of the court." Abbott continued, stating that as explained in the trial brief,

> [T]his dispute and the other two disputes all are intertwined. They all come from the same nexus of facts, parties, law. It's all based on one thing, this family dispute based on the Cavins['] unhappiness of their daughter marrying a particular person.
>
> And so in the -- the context of judicial economy and to avoid inconsistent rulings, even if we were past the deadline, it would make sense -- it would have made sense to simply wait, see what the Third Court of Appeals would have done on this case, on their claim, on our claims before we move forward on ours.

---

[5] Also, Abbott's counsel stated on the record that the good-cause argument was discussed in the trial brief presented to the court at the hearing; however, that trial brief was not made part of the appellate record.

10

. . . .

> . . . [T]o make completely clear what is required on the record, in the event the Court decides that [the TCPA motion] was untimely, I'm hereby making a request to grant an extension that the -- those -- the November 8th filing would be deemed timely.

Although the trial court's order did not expressly state that Abbott timely filed his TCPA motion, we may imply such a finding from its ruling because it granted the motion. *See* Tex. R. App. P. 33.1(a)(2)(A); *Well Sols., Inc. v. Stafford*, 32 S.W.3d 313, 316 (Tex. App.—San Antonio 2000, no pet.) ("A ruling is implicit if it is unexpressed but capable of being understood from something else."). And, as noted above, we must affirm the court's ruling on the motion's timeliness "if it can be upheld on any legal theory that finds support in the evidence." *Worford*, 801 S.W.2d at 109.

Although the TCPA allows the trial court to extend the deadline to file the motion to dismiss "on a showing of good cause," Tex. Civ. Prac. & Rem. Code § 27.003(b), the statute does not define "good cause." In the TCPA context, courts have concluded that "good cause may be established by showing that 'the failure involved was an accident or mistake, not intentional or the result of conscious indifference.'" *Saks & Co., LLC v. Li*, 653 S.W.3d 306, 311 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (quoting *Sullo v. Kubosh*, 616 S.W.3d 869, 900 n.7 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (noting that Texas Supreme Court has allowed good cause to be established in this manner in other contexts, including late filing of summary-judgment response)). Abbott argues that he relied in good faith on the date that the county court signed the order consolidating the County Suit into the District Suit as effectively consolidating the two cases and tolling his deadline to file a TCPA motion in the Consolidated Suit because of the statutory stay in place in the District Suit at the time of consolidation.

11

Abbott's position is arguably supported by legal authority. *See* Tex. R. Civ. P. 174(a) (allowing court to consolidate actions when they involve "common question of law or fact"); *id.* R. 306a (establishing that date of signing of judgment or order determines beginning of periods for court's plenary power for altering judgment or order); *In re Gulf Coast Bus. Dev. Corp.*, 247 S.W.3d 787, 795 (Tex. App.—Dallas 2008, orig. proceeding) (explaining that consolidation does not provide basis for reversal when cases share common questions of law and fact and record does not reveal actual prejudice); Tex. Civ. Prac. & Rem. Code § 51.014(b) (requiring stay of all trial-court proceedings while interlocutory appeal from denial of TCPA motion is pending).[6] Abbott asserts that if his reliance on the consolidation of the suits by the county court and on the statutory stay was an error, it was a good-faith mistake that establishes good cause for treating his TCPA motion as timely filed. We agree that even if it was error for the county court to consolidate the County Suit with the District Suit while the District Suit was stayed (although we note that the Cavins did not challenge that consolidation order by mandamus or otherwise)—an issue we need not reach—Abbott's reliance on the consolidation of the suits and the statutory stay of the District Suit that was in place when the suits were consolidated establishes good cause because his filing the motion outside the 60-day period "was the result of a mistake and not conscious indifference." *Saks & Co.*, 653 S.W.3d at 312 (concluding that movants' reliance on date movants agreed to "accept service" in parties' Rule 11 agreement when calculating TCPA motion's filing deadline, as opposed to earlier date of actual service on movants, established good cause as result of mistake).

---

[6] In addition, in a case decided after the events at issue in this case, the Texas Supreme Court held that a court of appeals erred by lifting a Section 51.014(b) stay for the limited purpose of allowing the trial court to hear two motions unrelated to the issues in the pending interlocutory appeal. *See In re Geomet Recycling LLC*, 578 S.W.3d 82, 85 (Tex. 2019) (orig. proceeding) (conditionally granting mandamus relief).

Because we conclude that good cause supported the trial court's extension of time for Abbott to file his TCPA motion, we overrule the Cavins' first issue.

## II.     Merits of Abbott's TCPA Motion

The Cavins' remaining three issues concern the merits of Abbott's TCPA motion: the evidence supporting Cavins' defamation claim and Abbott's affirmative defenses, their request for limited discovery to assess the merits of Abbott's affirmative defenses and affidavit and their objections to Abbott's TCPA evidence, and the amount of the attorneys' fees and sanctions that the trial court awarded to Abbott.

### A.  Standard of Review

We review de novo a trial court's ruling on a TCPA motion to dismiss, including whether each party has carried its respective burden under the TCPA.  *See Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 45-46 (Tex. 2021); *see also* Prior Tex. Civ. Prac. & Rem. Code § 27.005; *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.) (specifying that courts review de novo "whether a nonmovant has presented clear and specific evidence establishing a prima facie case for each essential element of the challenged claims"). When determining whether a legal action should be dismissed under the TCPA, courts must consider "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."  Prior Tex. Civ. Prac. & Rem. Code § 27.006(a).  We review the pleadings and evidence in the light most favorable to the nonmovant.  *Warner Bros. Ent., Inc. v. Jones*, 538 S.W.3d 781, 801 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020).

13

## B. TCPA Framework and Purpose

The Texas Legislature designed the TCPA in part to balance the competing interests between "the freedom to comment on matters of public concern" and "the rights of individuals harmed by false or misleading reporting." *D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 433 (Tex. 2017). The TCPA's purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002; *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017). The Texas Legislature has mandated that the TCPA "shall be construed liberally to effectuate its purpose and intent fully." Tex. Civ. Prac. & Rem. Code § 27.011(b). To accomplish the statute's purpose, the Legislature established "a motion-to-dismiss procedure that allows defendants who claim that a plaintiff has filed a meritless suit in response to the defendant's proper exercise of a constitutionally protected right to seek dismissal of the underlying action, attorneys' fees, and sanctions at an early stage in the litigation." *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing Tex. Civ. Prac. & Rem. Code § 27.003(a)).

Our review of a trial court's ruling on a TCPA motion to dismiss requires a three-step analysis. *See McLane Champions, LLC v. Houston Baseball Partners LLC*, 671 S.W.3d 907, 914 (Tex. 2023). As a threshold matter, the movant must demonstrate that the TCPA properly applies to the legal action against it. Prior Tex. Civ. Prac. & Rem. Code § 27.005(b) (requiring movant to show that legal action "is based on, relates to, or is in response to" movant's exercise of protected rights); *see also Lilith Fund for Reprod. Equity v. Dickson*,

662 S.W.3d 355, 363 (Tex. 2023). If the movant meets that burden, the nonmovant must establish by clear-and-specific evidence a prima facie case for each essential element of its claim. Tex. Civ. Prac. & Rem. Code § 27.005(c). If the nonmovant satisfies that requirement, the burden shifts back to the movant to establish "by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." Prior Tex. Civ. Prac. & Rem. Code § 27.005(d).

### C. Alleged Defamatory Statements and Abbott's Affirmative Defense

In their second issue, the Cavins assert that the trial court erred by granting Abbott's TCPA motion because they met their burden under the second step of the TCPA analysis to establish a prima facie case on each element of their defamation claim and Abbott failed to meet his burden under the third step to establish any affirmative defense to that claim.[7] Abbott responds that the Cavins failed to carry their TCPA burden to establish a prima facie case on all elements of their defamation claim. He further asserts that even if we conclude they established a prima facie case, we should affirm the trial court's order because Abbott established by a preponderance of the evidence his affirmative defenses of qualified privilege and substantial truth.

The elements of defamation are (1) publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) while acting with the requisite degree of fault, and (4) damages unless the statement constitutes defamation per se. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (orig. proceeding). Although in general a private individual alleging defamation need only prove negligence, *see id.*, when a defendant establishes the

---

[7] The parties do not dispute that the TCPA applies to the Cavins' defamation claim.

15

affirmative defense of qualified privilege, the plaintiff must prove that the defendant made the statements with actual malice, *Burbage v. Burbage*, 447 S.W.3d 249, 254 (Tex. 2014). In the defamation context, "actual malice" means that "the statement was made with knowledge of its falsity or with reckless disregard for its truth." *In re Lipsky*, 460 S.W.3d at 593.

### 1. The Allegedly Defamatory Statements

In their pleadings, the Cavins assert that Abbott made defamatory statements in four pieces of correspondence. The Cavins do not identify precisely which statements within the letters and emails are allegedly defamatory. Below are the Cavins' allegations regarding each piece of correspondence, followed by the text of the correspondence.

- **February 28, 2014 Abbott's email to Darryl Tietjen (Abbott's supervisor at PUC)** allegedly "falsely asserted that Mr. Cavin assaulted (by threatening) Mr. Abbott:"

Darryl, I'm going to be out Friday. Kristin's parents have gone off the deep end. Her father got a little violent with her tonight, and he sent me some threatening texts, including one that suggested he may try to confront me at the WBT garage tomorrow. If he does show up, please do not give out any information as to my whereabouts.

I'll try to keep my email up. My cell number is 512-[XXX]-[XXXX] (though I may be getting that changed soon).

- **March 20, 2014, Abbott's letter to Angie Wolf (PUC's human-resources director)** "falsely assert[ed] that Wylie and Dr. Lillian Cavin have harassed others, that they trespassed at Mr. Abbott's apartment, and that they made false statements to multiple parties": [8]

---

[8] The Cavins' pleadings reference only the March 20, 2014 letter from Abbott to Wolf. In their TCPA response and appellate brief, they also refer to a March 20, 2014 email from Abbott to Tietjen, Wolf, and Pam Whittington, in which Abbott stated,

Just to update: There was another instance of harassment yesterday. Kristin's father, Wylie, called my father at his place of work and pushed the same story

16

[2 opening paragraphs describing the history of Abbott's and Kristin's relationship]

Regarding any allegations of inappropriate conduct, I am unaware of the existence of any such allegations occurring before the evening that Kristin's father physically assaulted her (Feb. 27, 2014) after she refused to break up with me. In fact, within a few months after Kristin and I began dating romantically, her parents invited us out and we had a pleasant dinner together. They also invited me out to spend time with them on Christmas, though I was unable to make it out there due to a visit with my parents in Houston. Kristin has told me that a couple of weeks before the assault, her father suggested that she and I get engaged, but delay the wedding until after she has completed the Rice MBA program. At no time before the night of the assault did I receive any indication that they believed that anything inappropriate had occurred between Kristin and I while she worked at the PUC. It is my firm belief that any such allegations are not based on fact, but instead are attempts by Kristin's parents to harass us and control her. Since the night of the assault, and despite being told repeatedly to stop, Kristin, myself, and my parents have received frequent harassment from Kristin's parents, including threatening text messages, voicemails, as well as trespass at my apartment and false statements to multiple parties.

The above is true to the best of my knowledge and recollection,

William Abbott

- **April 25, 2014, Abbott's email to Pam Whittington (PUC employee who was second on list to be notified if the Cavins showed up at the PUC), Wolf, and Tietjen** "falsely assert[ed] that the Cavins had committed the crime of harassment, that they are mentally unstable, and that Wylie Cavin made false statements about Mr. Abbott in an email, among other things:"

Unfortunately there was another event late yesterday afternoon: Kristin's parents tracked down her classroom at UT and her mother, Lillian, accosted her outside of her classroom and physically attacked her, trying to prevent her from calling the police. Kristin ran back into the classroom and called the UT police, who then arrested the uncooperative Lillian.

---

they've been pushing recently, including mentioning something about how he had paid a few thousand dollars to reserve Kristin's seat at the Rice MBA program. I'm not sure if this is a sign that they will be re-escalating things, but wanted to keep everyone updated.

Upon being escorted by police back to her car near the classroom, Kristin found her father, Wylie, sitting in her car (the car title is in both of their names). He eventually left, taking her car, which contained some of her possessions, including some of her textbooks and her class notes for her upcoming finals. (She has arranged alternative transportation for now.)

We believe that this flare-up may be the result of Wylie figuring out that he no longer has control over Kristin's financial accounts (he had previously made her sign over power of attorney to him, which has since been revoked).

My guess is that after the arrest Kristin's parents are unlikely to resume trying to stir up trouble here at the PUC — their harassment decreased significantly after we called the police on them the time Wylie showed up at my apartment, and Wylie's narcissism might leave him in fear of further police involvement and public shame (and hopefully he understands that slander is a crime). However, Kristin's aunt, who has been very accurate in predicting Wylie and Lillian's behavior over the past couple of months, seems to think they may shift their harassment from Kristin and onto me via the PUC. It is also possible that their mental issues lead them to actually believe the distorted narrative that they are peddling in their attempts to reassert control over Kristin.

As an example of their false narratives that I'm not sure if they actually believe in or not:

Wylie sent a very hateful email to Kristin which included a largely false narrative about my past that he likely composed from a few details such as my permanent address history that he obtained when his private investigator did a background check. The narrative was primarily things that a narcissist would find embarrassing, suggesting that I'm too low-status and not wealthy enough for Kristin, such as that I have student loans, and lived with my parents until I was 30 (the latter of which is untrue, but their address was listed as my permanent address on all my financial records until around then as I lived in grad student housing or rented via sublease most of that time).

As I was writing this, I did receive a phone call from a "Private line" number that left no voicemail, and I got a similar call yesterday afternoon — I'm not sure if that is them or not, so maybe Kristin's aunt is correct.

I am planning to give DPS CID agent Torrez an update shortly.

Anyway, just wanted to keep you all in the loop, thanks for your support.
-Bill

- **June 13, 2014 Abbott's email to Whittington, Wolf, Brian Lloyd (PUC's executive director), and copying Tietjen and Kristin** "falsely assert[ed] that Mr. Cavin has sent slanderous letters:"

Dear all,

The harassment-free period of quiet may have come to an end:

o The Travis County DA dropped charges against Lillian Cavin, Kristin's mother last week.

o Wylie Cavin has resumed the sending of slanderous letters, this time to family members that Kristin is still in regular contact with.

    o We believe that Kristin's parents, Wylie and Lillian, have learned about our upcoming wedding and that she is now working at the PUC. We are not sure if they obtained this information via family members or private investigators. Some information in the letter suggests that Wylie may have hired several investigators, including some that followed me or us around for a period of time and monitored my apartment and perhaps my internet activity — if this is the case, they may still be monitoring us.

    o Starting Wednesday afternoon (June 11th), I received a couple of phone calls from an "unknown number", one on my cell phone and one at the office, with no voicemails left.

    o Kristin has received several similar "unknown number" calls on her office phone over the past few days also with no messages left.

We suspect that this flare-up is the result of the charges being dropped and of Wylie and Lillian learning of the wedding, and the fact that some family members will be in attendance. The purpose of the recent letter was to isolate Kristin from family members who are sympathetic to her situation by encouraging those family members to withdraw any support for Kristin.

We are still hopeful that the arrest has reduced the likelihood of personal confrontation here at the office, however the phone calls suggest that they may be trying to resume their harassment and stalking.

I have previously informed DPS CID agent Rudy Torrez that Kristin was back at the PUC, and that she had changed her last name, and I plan to update him soon on the latest developments.

Thank you again,
Bill

19

## 2. Abbott's Affirmative Defense of Qualified Privilege

If Abbott established his affirmative defense of qualified privilege by a preponderance of the evidence, then the trial court properly granted his TCPA motion to dismiss even if the Cavins established a prima facie case on each element of their defamation claim. See Prior Tex. Civ. Prac. & Rem. Code § 27.005(d). Thus, we turn to Abbott's affirmative defense of qualified privilege because we conclude it is dispositive.

"The common law provides a qualified privilege against defamation liability when 'communication is made in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication.'" *Burbage*, 447 S.W.3d at 254 (quoting *Cain v. Hearst Corp.,* 878 S.W.2d 577, 582 (Tex. 1994)). Because "defamation actions necessarily inhibit free speech . . . the qualified privilege offers an additional safeguard, even in cases of private, non-political speech." *Id.* "The privilege operates as an affirmative defense in the nature of confession and avoidance; the defendant bears the burden of proving privileged publication unless the plaintiff's petition affirmatively demonstrates privilege." *Id.*

Once a defendant establishes the privilege, the burden shifts to the plaintiff to prove that the defendant made the statements with actual malice. *Id.* In the defamation context, "actual malice" means that "the statement was made with knowledge of its falsity or with reckless disregard for its truth." *In re Lipsky*, 460 S.W.3d at 593. When the statements at issue employ unambiguous language and when the facts and circumstances of publication are undisputed, qualified privilege presents a question of law. *Burbage*, 447 S.W.3d at 254.

Abbott contends that the privilege attaches here to his communications that were made to his employer, the PUC, because the PUC had an interest and a duty in the matter to

20

which the communications related. All of Abbott's communications to the PUC concerned the safety and welfare of its employees—himself, Kristin, and all employees. While the Cavins may dispute Abbott's interpretation of the events, they do not dispute the occurrence of the events that triggered each of the communications.

Each of the allegedly defamatory communications contains unambiguous language demonstrating Abbott's stated intent, attested to in his affidavit, "to keep the PUC apprised of the ongoing dispute between me and the Cavins." Abbott's first February 2014 email to his direct supervisor Tietjen informed Tietjen that Abbott would not be coming into work the next day because after Wylie had a "violent" confrontation with Kristin, Wylie had sent Abbott "threatening texts, including one that suggested he may try to confront me at the WBT garage tomorrow," and asked Tietjen not to tell Wylie where he was if Wylie showed up at the PUC.

Abbott's subsequent communications all occurred after the Cavins accused him of sexual harassment and domestic violence against Kristin, prompting the PUC to investigate Abbott's relationship with Kristin, as well as the involvement of a DPS Criminal Investigations Division Agent in the situation. In his March 2014 letter to Wolf, Abbott offered his "firm belief" that the Cavins' allegations against him were not based on fact, but instead were the Cavins' attempts to harass the Abbotts and control Kristin. He also informed Wolf of the Cavins' repeated unwanted contacts with him, Kristin, and Abbott's parents, which Abbott characterized as harassing and threatening.

Abbott's April 2014 email to involved PUC employees, including Wolf and Tietjen, was sent to "keep [them] all in the loop" about Lillian's altercation with Kristin on the UT campus, which had resulted in Lillian's arrest. Abbott also informed them of his speculation about the reasons for the Cavins' uptick in unwanted contact and the possibility that after

21

Lillian's arrest they might "shift their harassment from Kristin onto [Abbott] via the PUC." In addition, Abbott stated his intent to update Agent Torres about the altercation and arrest.

Abbott's June 2014 email to involved PUC employees, including Wolf and Tietjen, informed them that "[t]he harassment-free period of quiet may have come to an end" and that although the Abbotts were "still hopeful that the arrest has reduced the likelihood of personal confrontation here at the office, . . . the phone calls suggest that they may be trying to resume their harassment and stalking." Abbott also advised them that he had "previously informed DPS CID agent Rudy Torrez that Kristin was back at the PUC, and that she had changed her last name, and [he] plan[ned] to update him soon on the latest developments."

The unambiguous language in the statements shows that Abbott made these statements to the PUC to keep them apprised of his concern for his own and Kristin's safety and the safety of all PUC employees and to respond to the Cavins' allegations to his employer of wrongdoing by him and an inappropriate relationship with Kristin. Wolf testified to the PUC's interest in and goal of making its employees feel safe in the workplace as motivating both the initial investigation into Abbott's relationship with Kristin and the PUC's subsequent efforts to keep the Cavins from contacting the Abbotts at their workplace. We conclude that this unambiguous language in the statements and the undisputed facts and circumstances of the Cavins' allegations to Abbott's employer of sexual harassment and domestic violence and the occurrence of physical altercations between the Cavins and Kristin establish by a preponderance of the evidence that Abbott's statements are covered by the privilege. *See* Prior Tex. Civ. Prac. & Rem. Code § 27.005(d). Thus, the burden shifted to the Cavins to establish that Abbott made the statements with actual malice.

22

"[A]ctual malice concerns the defendant's attitude toward the truth, not toward the plaintiff." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 165 (Tex. 2004). "The actual malice standard requires that a defendant have, subjectively, significant doubt about the truth of his statements at the time they are made." *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002). Abbott attested that when he met with Agent Torres on March 11, 2014, "Agent Torres instructed me to keep the PUC informed of any developments regarding the Cavins and any attempts by them to contact me or Kristin Abbott. It was Agent Torres' expert opinion that the Cavins would attempt to contact me again at the PUC." Abbott further attested that he

> was not personally present when my wife was assaulted by her father, but considering how frightened and distraught she was when she was telling me about it after it happened, I was convinced my wife was telling the truth. I remained supportive and was present after the police arrived to take my wife's statement.

Kristin reported both the February and April assaults to the police, and she also attested to the occurrence of both assaults. In light of this evidence, we cannot conclude that Abbott's statements that Kristin was assaulted by the Cavins were made with knowledge that they were false, or with reckless disregard for the truth. We can also infer from these circumstances that Abbott did not make the statements about the possibility that the Cavins would step up their attempts to make unwanted contact with the Abbotts at their workplace with knowledge of their falsity or with reckless disregard for the truth. *See In re Lipsky*, 460 S.W.3d at 589 (explaining that circumstantial evidence is "indirect evidence that creates an inference to establish a central fact," and "[i]t is admissible unless the connection between the fact and the inference is too weak to be of help in deciding the case" and that in some cases, determination of certain facts "may exclusively depend on such evidence"); *see also, e.g., Bentley*, 94 S.W.3d at 596 (considering

23

defamation claim and noting that claims involving proof of defendant's state of mind "must usually [ ] be proved by circumstantial evidence"). The Cavins do not point to any evidence, circumstantial or direct, supporting a conclusion that Abbott's statements to the PUC were made for any other reason than keeping his employer apprised of a possible workplace-safety issue.

We conclude that Abbott established his qualified-privilege affirmative defense by a preponderance of the evidence, and we overrule the Cavins's second issue. We affirm the trial court's order granting the TCPA motion.

### D. The Cavins' Discovery and Evidentiary Complaints

In their third issue, the Cavins contend that the trial court abused its discretion both by denying their motion for limited discovery to assess Abbott's affirmative defenses and by denying their hearsay objections to Abbott's affidavit and to Tietjen's memorandum to Wolf providing his view of Abbott and Kristin's relationship when Kristin was first employed at the PUC.

#### 1. The Cavins' Motion for Limited TCPA Discovery

The Cavins assert that the trial court abused its discretion by its orders denying their motion for limited discovery under TCPA Section 27.006(b) and overruling their objections to Abbott's affidavit. The filing of a motion to dismiss under TCPA Section 27.003(c) stays "all discovery in the legal action" until the trial court rules on the motion to dismiss. Tex. Civ. Prac. & Rem. Code § 27.003(c). However, TCPA Section 27.006(b) provides that "[o]n a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion." *Id.* § 27.006(b).

24

In their motion for limited discovery, the Cavins sought to take two-hour depositions of Tietjen, Lloyd, Whittington, and Abbott, asserting that this discovery was necessary to rebut Abbott's affirmative defenses and statements in his affidavit. Relevant to our analysis here, they asserted that good cause existed to allow these depositions to enable them to test Abbott's qualified-privilege assertion and his supporting argument that his statements to the PUC were made in the course of its investigation. In response, Abbott argued that the general need for depositions to defend against a TCPA motion is insufficient to show good cause under the statute. *See In re D.C.*, No. 05-13-00944-CV, 2013 WL 4041507, at *1 (Tex. App.—Dallas Aug. 9, 2013, orig. proceeding) (granting mandamus relief from trial court's order compelling two depositions and release of defendant's forensic interview with child advocacy center concerning alleged sexual assault by nonparty to case). Abbott also explained that the Cavins had begun seeking discovery from him and Kristin beginning in 2015 in connection with the Whitley and Hayes Suits, and in October 2016, parties to all three suits signed a Rule 11 agreement allowing use of any witness's deposition testimony in any of the suits. Abbott argued that because over the year between the execution of the Rule 11 agreement and the Cavins' motion for limited discovery, the Cavins had taken "the depositions of over ten witnesses, including William and Kristin Abbott, all relating to facts at issue in this case," any additional discovery would be excessive and burdensome. Abbott further argued that because he asserted the common-law qualified privilege in his September 2016 answer, his reliance on the privilege in the TCPA motion was not a surprise to the Cavins.

On this record, we cannot conclude that the trial court abused its discretion by denying the Cavins' motion for limited discovery. *See Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992) (orig. proceeding) (holding that abuse of discretion occurs when trial court's

25

decision is so arbitrary and unreasonable that it amounts to clear and prejudicial error of law or if trial court clearly fails to correctly analyze or apply law to facts); *see also In re SSCP Mgmt., Inc.*, 573 S.W.3d 464, 472 (Tex. App.—Fort Worth 2019, orig. proceeding) (collecting cases and noting that while TCPA does not define scope of "specified and limited discovery relevant to the motion to dismiss," courts have allowed nonmovants "to conduct abbreviated discovery, such as a short deposition of the TCPA movant or very truncated document production"). The Cavins do not dispute that they had deposed Abbott before filing their motion for limited discovery. In addition, the Cavins had access to and relied on the PUC's human-resources director Wolf's deposition in their response, which addressed the PUC's investigation of the Cavins' allegations against Abbott and its interest in and goal of making its employees feel safe in the workplace. The trial court did not abuse its discretion by concluding that the Cavins had not shown good cause for taking the additional requested depositions of the PUC's executive director and other PUC employees. *See Walker*, 827 S.W.2d at 840 (explaining that party challenging trial court's decision must establish that trial court could reasonably have reached only one decision).

### 2. The Cavins' Objections to Abbott's TCPA Evidence

The Cavins objected to several statements in Abbott's affidavit as hearsay and also sought to strike as hearsay Tietjen's April 2014 memorandum to Wolf summarizing Tietjen's recollections of Abbott's and Kristin's interactions and working relationship during Kristin's first three-year stint at the PUC. On appeal, the Cavins contend that the trial court abused its discretion by overruling those objections. In their brief, in addition to the Tietjen memorandum, they focus on the following four statements from Abbott's affidavit:

26

- "Agent Torres instructed me to keep the PUC informed of any developments regarding the Cavins and any attempts by them to contact me or Kristin Abbott."

- "It was Agent Torres' expert opinion that the Cavins would attempt to contact me again at the PUC."

- "I was asked by the PUC to provide this written statement [Abbott's March 20, 2014 letter to Wolf] to aid them in their investigation."

- "The PUC ultimately concluded that the Cavins' allegations against me were baseless and without merit."

The admission or exclusion of evidence is a matter within the trial court's discretion. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We must uphold the trial court's evidentiary ruling if any legitimate basis in the record supports it. *Id.* And we will not reverse a trial court's judgment based on an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *Id.* (citing Tex. R. App. P. 44.1). To conduct this harm analysis, we review the entire record. *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). Evidentiary rulings do not usually cause reversible error unless an appellant can demonstrate that the judgment turns on the specific evidence that was admitted or excluded. *Id.* We will not reverse a trial court's judgment for an erroneous ruling on admissibility of evidence if the challenged evidence is cumulative and not controlling on a material issue that is case dispositive. *Id.* As an initial matter, we note that the Cavins do not articulate how the challenged statements are controlling on a material issue and not cumulative or how they probably caused the rendition of an improper judgment.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). The proponent of hearsay bears the burden to show that the testimony fits within an

exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004). In addition, an out-of-court statement is not hearsay if it has relevance apart from the truth of the matter that it asserts or implies. *See Jackson v. Johnson*, No. 12-22-00297-CV, 2024 WL 1101159, at *8 (Tex. App.—Tyler Mar. 13, 2024, no pet.) (mem. op.).

Here, the first of the challenged statements is not hearsay. In the chronology of events offered by Abbott in his affidavit, this statement is offered to show its effect on Abbott as the listener, not for the truth of the matter asserted. *See In re Bexar Cnty. Crim. Dist. Attorney's Off.*, 224 S.W.3d 182, 189 (Tex. 2007) (orig. proceeding). This statement explains his reason for making the April 2014 and June 2014 statements apprising the PUC of the Cavins' continued unwanted contact with him and Kristin, which was that Agent Torres instructed him "to keep the PUC informed of any developments regarding the Cavins and any attempts by them to contact me or Kristin Abbott." Similarly, the third statement, that Abbott was asked by the PUC to provide the March 20, 2014 letter to Wolf to aid the investigation, is also offered to show its effect on Abbott as the listener and his reason for making the statements in that letter.

The Cavins urge us to conclude that Abbott offered for the truth of the matters asserted those two statements, as well as the second statement (Torres's "expert opinion" that the Cavins likely would contact Abbott again at work). These statements potentially touch on the material issue of whether Abbott's communications to the PUC were made in good faith as required to establish the qualified privilege against defamation. *See Burbage*, 447 S.W.3d at 254. However, even if we were to agree that Abbott offered these statements for the truth of the matters asserted instead of for their effect on Abbott, in light of Wolf's testimony about the PUC's interest in and goal of making its employees feel safe in the workplace, we cannot

28

conclude that these statements are controlling on a material issue or probably caused the rendition of an improper judgment.[9] Whether Agent Torres instructed Abbott to keep him and the PUC informed of further actions by the Cavins is immaterial to our conclusion that Abbott's communications with his employer about the Cavins' unwanted contact with him and Kristin and the possibility of the Cavins' attempting to contact them at their workplace are protected by the common-law qualified privilege. The PUC has an interest in providing a safe workplace for its employees, and we do not need to conclude that Abbott's communications were made at the instruction of Torres or the PUC to conclude that those communications are protected.

As for the other challenged statements, Abbott's fourth statement that "[t]he PUC ultimately concluded that the Cavins' allegations against me were baseless and without merit" was cumulative of Wolf's deposition testimony. *See Able*, 35 S.W.3d at 617. And contrary to what the Cavins argue, Abbott did not offer Tietjen's April 2014 memorandum (which Wolf authenticated at her deposition) for the truth of the matter asserted in that document, i.e., Tietjen's observations about the nature of Abbott's and Kristin's relationship during Kristin's first round of employment at the PUC from 2010-2013. Instead, Abbott cited it in his TCPA motion as a letter provided by his supervisor "in support of the internal investigation" conducted by the PUC in response to the Cavins' allegations against him. In other words, he provided it as an example of the information that the PUC sought in conducting its investigation of the Cavins' allegations and to show that such an investigation was conducted.

Accordingly, because all of the challenged statements are either not hearsay or not controlling on a material issue or are cumulative of other admissible testimony, we hold that a

---

[9] In addition, Wolf testified that the PUC was in fact investigating the Cavins' allegations against Abbott, making Abbott's statement that the PUC asked him to provide the March 20, 2014 letter to aid in its investigation cumulative of Wolf's testimony.

legitimate basis in the record supports the trial court's evidentiary ruling and that the trial court did not err in that evidentiary ruling. Having held that the trial court did not err by denying the Cavins' motion for limited discovery and by overruling their objections to Abbott's TCPA evidence, we overrule the Cavins' third issue.

**E. The Trial Court's Award of Attorneys' Fees and Sanctions**

In their fourth issue, the Cavins challenge the trial court's order awarding Abbott $21,500 in attorneys' fees and $20,000 in sanctions. *See* Prior Tex. Civ. Prac. & Rem. Code § 27.009. Prior TCPA Section 27.009 provided that when the trial court orders the dismissal of a legal action under the TCPA,

> the trial court shall award to the moving party:
>
> (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and
>
> (2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.

*Id.* § 27.009(a)(1)-(2). The Cavins contend that the trial court abused its discretion by awarding (1) excessive attorneys' fees, asserting that the award was unreasonable for several reasons, and (2) excessive sanctions, arguing that the record supports that the award was punitive rather than designed to deter future filing of similar actions.

We review the trial court's awards of fees and sanctions for an abuse of discretion. *See Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016) (concluding that trial court's determination of reasonable attorneys' fees under TCPA "rests within the court's sound discretion" and does not specifically include considerations of justice and equity); *Serafine*

30

*v. Blunt*, No. 03-20-00294-CV, 2021 WL 5456660, at \*6 (Tex. App.—Austin Nov. 19, 2021, pet. denied) (mem. op.) ("We review the trial court's [TCPA] sanctions award for abuse of discretion." (citing *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007)). We cannot conclude that a trial court has abused its discretion merely because we would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. Instead, the appropriate inquiry is the familiar one—whether the court acted without reference to any guiding principles, that is, whether the court's act was arbitrary or unreasonable. *Low*, 221 S.W.3d at 614.

### 1. TCPA Attorneys' Fees

"A 'reasonable' attorney's fee is 'one that is not excessive or extreme, but rather moderate or fair.'" *Sullivan*, 488 S.W.3d at 299 (quoting *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010)). The lodestar method is the proper method for calculating reasonable and necessary attorneys' fees "in any situation in which an objective calculation of reasonable hours worked times a reasonable rate can be employed." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019). In *Rohrmoos*, the Texas Supreme Court reaffirmed that the factfinder's calculation of an attorneys' fee award should be based on its determination of "the reasonable hours worked multiplied by a reasonable hourly rate." *Id.* The fee claimant bears the burden to provide sufficient evidence of the reasonable hours worked and the reasonable hourly rate. As outlined by the court,

> [s]ufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. This base lodestar figure should approximate the reasonable value of

31

> legal services provided in prosecuting or defending the prevailing party's claim through the litigation process.

*Id.* (citation omitted). The court may adjust the lodestar up or down based on relevant considerations. *Id.* at 500-01 (explaining that if claimant seeks enhancement or opponent seeks reduction, each respectively bears burden to provide specific evidence to overcome presumptive reasonableness of base lodestar figure). While contemporaneous billing records are not required to prove that requested fees are reasonable and necessary, they are "*strongly* encouraged to prove reasonableness and necessity when those elements are contested." *Id.*

After the trial court granted his TCPA motion to dismiss, Abbott sought $84,141.69 in attorneys' fees, plus attorneys' fees incurred on appeal. He submitted an attorneys' fee affidavit and his attorneys' billing records in support of his request. The trial court awarded him $21,500 in fees.

On appeal, the Cavins do not challenge the sufficiency of Abbott's evidence of attorneys' fees, the qualifications of the attorney witnesses, or the rates the attorneys charged. Instead, they complain that (1) it is unreasonable that the trial court awarded Abbott the same amount of attorneys' fees that they were awarded after they successfully pursued their own TCPA motion to dismiss, which they assert was more complex and required more work than Abbott's motion, (2) Abbott should have segregated fees incurred for other proceedings, (3) Abbott sought fees for TCPA-related work during the period of time that the Consolidated Suit was stayed for the Cavins' interlocutory appeal of their TCPA motion, and (4) Abbott improperly sought fees incurred only in pursuit of other fees and for two tasks they complain were unreasonable.

The Cavins do not point us to specific time entries in the billing records to support their contentions and do not provide us with specific amounts of fees that they assert were improperly sought, making it difficult for us to discern whether the amounts they allege Abbott improperly sought would reduce the total award to less than $21,500. In addition, the TCPA requires the trial court to award "reasonable attorney's fees . . . incurred in defending against the legal action," *see* Prior Tex. Civ. Prac. & Rem. Code § 27.009(a)(1), and other courts have concluded that it is not an abuse of discretion for a trial court to award fees for "defensive work," such as "investigating the plaintiff's claims, answering the petition, responding to motions for discovery, attending the hearing on the motion to dismiss, filing motions for protection to and quash subpoenas, and attending the hearing on attorney's fees," *Cardio Grp., LLC v. Kring*, No. 05-22-00101-CV, 2022 WL 17817971, at *6 (Tex. App.—Dallas Dec. 20, 2022, no pet.) (mem. op.). *See also Joselevitz v. Roane*, No. 14-18-00172-CV, 2020 WL 1528020, at *7 (Tex. App.—Houston [14th Dist.] Mar. 31, 2020, no pet.) (mem. op.) (affirming award that included fees for pre-suit activities and appellate fees and collecting similar cases). As one court has explained, "A TCPA movant may recover fees incurred in defending against the legal action, not just fees incurred in prosecuting a TCPA motion." *Mishkoff v. Garrett*, No. 05-22-01063-CV, 2024 WL 770142, at *6 (Tex. App.—Dallas Feb. 26, 2024, pet. denied) (mem. op.).

After the trial court granted his TCPA motion, Abbott amended his request for attorneys' fees several times to defend against continued legal action by the Cavins, including a mandamus seeking to challenge the trial court's order granting the motion and an emergency motion and mandamus petition in the Texas Supreme Court seeking to stay proceedings in the trial court after their mandamus was denied by this Court. *See In re Cavin*, No. 03-18-00113-CV, 2018 WL 2016379, at *1 (Tex. App.—Austin Apr. 30, 2018, orig. proceeding); *In re Cavin*,

33

No. 18-0537 (Tex. Aug. 17, 2018) (orig. proceeding). The Cavins also sought to appeal the nonappealable interlocutory order granting Abbott's TCPA motion to dismiss before a final order was issued in the Consolidated Suit. *See Cavin II*, 2018 WL 2016284, at *4 (dismissing appeal for want of jurisdiction). And as we have previously noted, the parties signed a Rule 11 agreement in which they agreed to go forward with discovery in the Whitley and Hayes Suits while the Consolidated Suit was stayed, streamline the number of depositions that would be taken, and allow those depositions to be used in all suits. On this record, we conclude that the trial court did not abuse its discretion by awarding Abbott $21,500 in attorneys' fees for defending the legal action.

### 2. Sanctions

The Cavins challenge the trial court's $20,000 sanctions award, asserting that it is excessive and plainly meant to be a punishment, rather than the deterrent required by the TCPA. As we have previously observed, Section 27.009(a)(2) "gives the trial court broad discretion to determine what amount is sufficient to deter the party from bringing similar actions in the future." *Kinney v. BCG Att'y Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *11 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.). Here, the record reflects that the Cavins filed three separate lawsuits alleging defamation for statements that arose out of their unwanted contact with the Abbotts. Even though the Whitley and Hayes Suits were not filed against the Abbotts, the Cavins sought discovery from them in connection with those suits, which were ultimately consolidated into the Consolidated Suit. As noted above, the Cavins also sought to appeal the trial court's nonappealable interlocutory order on the TCPA motion to dismiss, despite the lack of authority in Texas Civil Practice & Remedies Code Section 51.014

for an interlocutory appeal of an order granting a TCPA motion to dismiss. The trial court was within its discretion to consider the Cavins' litigation history in awarding sanctions. *See, e.g*, *Jetall Cos., Inc. v. Johanson*, No. 01-19-00305-CV, 2020 WL 6435778, at *7 (Tex. App.—Houston [1st Dist.] Nov. 3, 2020, no pet.) (mem. op.) (affirming sanctions award that exceeded attorneys' fee award). "It was the trial judge's prerogative to weigh this evidence along with all the other evidence in determining, as a matter of discretion, how large the sanction needed to be to accomplish its statutory purpose." *American Heritage Cap., LP v. Gonzalez*, 436 S.W.3d 865, 881 (Tex. App.—Dallas 2014, no pet.), *disapproved of on other grounds by Hersh v. Tatum*, 526 S.W.3d 462 (Tex. 2017). On this record, we conclude that the sanctions award of $20,000 was not arbitrary or unreasonable and the trial court did not abuse its discretion by awarding this amount.

Having held that the trial court did not abuse its discretion by awarding $21,500 in attorneys' fees and $20,000 in sanctions to Abbott, we overrule the Cavins' fourth issue.

## CONCLUSION

Having overruled the Cavins' issues, we affirm the trial court's orders granting Abbott's TCPA motion to dismiss, denying the Cavins' motion for limited TCPA discovery, overruling the Cavins' objections to Abbott's TCPA evidence, and awarding Abbott attorneys' fees and sanctions.

_____

Gisela D. Triana, Justice

35

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: August 7, 2025